## MISSISSIPPI VALLEY TRUST COMPANY, Appellant, v. GEORGE BEGLEY and EFFIE M. RUTH.

### In Banc, August 25, 1925.

1. **DURESS: Threatened Civil Action.** Threats to institute a civil suit by attachment, wherein the felonious acts of one of the makers of the note sued on—the son of one of the defendant indorsers and the son-in-law of the other—would be exposed, are sufficient, as a plea of duress by such indorsers, to obviate the contract evidenced by the note. In any event, evidence of such threats, if there were such, would be competent to show the state of mind of the indorsers at the time they signed the note. [Following Miss. Valley Trust Co. v. Begley, 298 Mo. 684.]

2. ————: ————: **Made Directly to Indorser.** Testimony that threats were made directly to the father of a son who had forged certain notes, to bring an attachment suit and thus expose the forgeries of the son, and to prosecute the son criminally, unless the father indorsed the note in suit, given in lieu of such forged notes, is admissible.

3. ————: ————: **Made through Another: Hearsay.** A commission and a request by the payee of the note, alleged to be the product of duress, to the general attorney of one of the indorsers, to see her and impress on her the necessity for her signature to the note within two hours, as the only means of avoiding an attachment against her son-in-law, who had forged the notes in lieu of which the one in suit was given, coupled with frequent refusal by the

payee to say whether the son-in-law would be prosecuted unless his mother-in-law signed the note, were in legal effect the acts of the payee, and the threats borne by the attorney to the indorser are to be considered as threats made directly to her by the payee in person, and testimony thereof is admissible.

4. ———: **Findings of Jury.** The findings of the jury that certain threats were made to the indorser of the note sued on, if supported by evidence which is both substantial and competent, preclude the appellate court from making different findings.

5. ———: **Stare Decisis: Second Appeal: Threatened Civil Action: Rules Pertinent to Threatened Criminal Prosecution.** The opinion in Mississippi Valley Trust Co. v. Begley, 298 Mo. 684, which placed a threatened civil action in attachment, which would in itself expose a felony, upon the same plane as a threatened criminal prosecution, becomes the law of the same identical case on a second appeal; and hence, as that opinion, in determining the admissibility of certain evidence relating to the pleaded defense of duress, is based upon the rulings in cases wherein criminal prosecution was threatened, the court in this case should go to the whole field of duress cases, to determine the admissibility of threats alleged to have been brought to the knowledge of the defendant indorsers of the note sued on prior to its execution.

6. **DURESS: Threats: Indirectly Communicated: Through Third Parties: Hearsay.** Threats to prosecute a son-in-law for forgery, if communicated to his mother-in-law and they produce in her mind such fear as deprived her of the free will necessary as a quality of mind to make a valid contract, and induced by them she indorses his note, amount to duress, and avoid the instrument as to her, whether the threatened action is communicated to her directly by the creditor, or indirectly through a third person; and hence testimony of witnesses that, at the request of the representatives of the payee of the note sued on, they communicated to her, before she indorsed it, their threats to prosecute her son-in-law, or to institute such a civil action as would expose his crime of forgery, unless she indorsed it, and the effect upon her state of mind of such communicated threats, is competent, although none of the payee's representatives was present when the threats were communicated to her.

7. **PRIVILEGED COMMUNICATION: Stenographer's Notes.** The notes of a stenographer, employed by defendant, and her transcript thereof, which included the petition, affidavit and bond for an attachment suit, which defendant had threatened to institute (and which would have exposed the felony of a son-in-law if it had been instituted) unless his father and mother-in-law indorsed a note

for the amount of his forgeries, are not communications between attorney and client, and are not privileged communications, but her identification of the transcript and the instruments themselves are admissible in evidence, in support of a defense of duress to a suit on the note to the effect that their indorsements were induced and procured by the threatened attachment.

8. ———: **Forged Blank Deed.** The introduction in evidence of a blank deed of trust from the office of a forger upon which appears the seal of an acknowledging officer, tends only to confirm his previous frank admissions that he had forged the notes given in lieu of the one sued on, and is harmless.

9. ———: **Retrial in Accordance with Former Opinion: Affirmance.** Where an action on a note, to which a defense of duress was pleaded, has been re-tried in accordance with the opinion rendered on its former appeal, and the verdict for defendant is supported by what, in the light of that opinion, was competent and substantial evidence, and the instructions in the light of that opinion are likewise free from error, the judgment will be affirmed, notwithstanding the duress pleaded consisted of threats to bring a civil action which would expose the crime of forgery, and notwithstanding the fact that at common law duress could not be predicated upon threats to institute a civil action founded on an admitted forgery.

Corpus Juris-Cyc. References: **Appeal and Error,** 4 C. J., Section 2834, p. 853, n. 59, p. 854, n. 71; Section 2957, p. 978, n. 4; Section 3265, p. 1213, n. 83, p. 1214, n. 84. **Bills and Notes,** 8 C. J., Section 1341, p. 1027, n. 11. **Contracts,** 13 C. J., Section 325, p. 404, n. 20, 21, 23 New. **Witnesses,** 40 Cyc. p. 2366, n. 11.

Appeal from Butler Circuit Court.—*Hon. Almon Ing,* Judge.

AFFIRMED.

*T. M. Pierce, Henson & Woody* and *Samuel H. Liberman* for appellant.

(1) Hearsay evidence was inadmissible to prove the alleged threats of plaintiff. The court erred in admitting the following testimony, purely hearsay, and in many instances hearsay based upon hearsay, and conduct based upon hearsay: (a) Testimony of defendant George Begley, Sr., as to statements made to him by Meredith and George Begley, Jr., concerning threats alleged to

have been made to the latter by plaintiff, and testimony as to statements made by him to defendant Mrs. Ruth as to statements made to him by Meredith and George Begley, Jr. (b) Testimony of defendant Effie M. Ruth as to statements made to her by George Begley, Sr., Meredith and George Begley, Jr., concerning threats alleged to have been made to them by plaintiff and as to statements made to her by George Begley, Sr., as to statements made to him by Meredith and George Begley, Jr., concerning the alleged threats. (c) Testimony of Harry I. Ruth as to statements made in his presence by George Begley, Sr., Meredith and George Begley, Jr., concerning threats alleged to have been made by plaintiff, and as to statements of George Begley, Sr., as to statements made to him by Meredith and George Begley, Jr., concerning the alleged threats. (d) Testimony as to the effect of the hearsay statements and acts done in reliance thereon. Re Sizer, 267 S. W. 922; Connel v. Haase & Sons Fish Co., 257 S. W. 760; Atkinson v. Am. School of Osteopathy, 240 Mo. 338; State v. Hyde, 234 Mo. 200; Lindsay v. Bates, 223 Mo. 294; Gordon v. Burris, 141 Mo. 602; St. Louis v. Arnot, 94 Mo. 275; Wood v. Hicks, 36 Mo. 327; Truesdail v. Sanderson, 33 Mo. 532; Chouteau v. Searcy, 8 Mo. 733; Fuller v. Dry Goods Co., 189 Mo. App. 514; Swift & Co. v. Scott, 181 Mo. App. 1; Whimster v. Holmes, 177 Mo. App. 130; Bowman v. Mining Co., 168 Mo. App. 703; L. & N. Ry. Co. v. Murphy, 150 Ky. 176; 22 C. J. par. 175, p. 215. (2) The declarations and statements by Meredith and George Begley, Jr., to defendants and by defendants to each other, not made in the presence of plaintiff and not authorized by plaintiff were not binding on the plaintiff and were hearsay. Dunnigan v. Green, 165 Mo. 98; Fogue v. Burgess, 71 Mo. 389; O'Neill v. Crain, 67 Mo. 251; Coble v. McDaniel, 33 Mo. 363; Atkisson v. Steamboat Castle Garden, 28 Mo. 124; Gorin Bank v. Early, 260 S. W. 480; Am. Tr. Co. v. Moore, 248 S. W. 983; Hunter v. Gas Engine Co., 237 S. W. 819; Mathewson v. Larson Myers Co., 217 S. W. 609; Lorton v. Trail, 216 S. W. 54; Strother v. McFarland, 184 S. W.

483; Knapp v. Hanley, 108 Mo. App. 353; Compton v. Bunker Hill Bank, 96 Ill. 301; Green v. Scranage, 19 Iowa, 461; Ely v. Insurance Co., 110 S. W. 265; Long v. Branham, 99 S. W. 271.   (3)   The testimony of defendants as to why they endorsed the note embodied conclusions as to the main facts in issue and invaded the province of the jury.  Unrein v. Oklahoma Hide Co., 295 Mo. 353; Meredith v. Meredith, 287 Mo. 250; Wigginton v. Rule, 275 Mo. 412; Eubank v. City of Edina, 88 Mo. 650; Laytham v. Agnew, 70 Mo. 48; Shortridge v. Rafeissen, 204 Mo. App. 166; Landers v. Railroad, 134 Mo. App. 80; 22 C. J. par. 597, p. 502.   (4)   The petition, bond and affidavit dictated by attorneys for plaintiff to stenographer Higgins were privileged and it was prejudicial error to admit them in evidence.  Tyler v. Hall, 106 Mo. 313; State v. Dawson, 90 Mo. 149; State ex rel. Douglas v. Tune, 199 Mo. App. 404; Leschen v. Brazelle, 164 Mo. App. 415; Landsberger v. Gorham, 5 Cal. 450; Neal v. Patten, 47 Ga. 73; Fire Assn. v. Fleming, 78 Ga. 733; Bingham v. Walk, 123 Ind. 164; Snow v. Gould, 74 Me. 540.   (5)   The blank deed signed by John T. Walton, notary, was inadmissible in evidence.  Howell v. Sherwood, 242 Mo. 513; Goble v. Kansas City, 148 Mo. 470; Heffernan v. Neumond, 198 Mo. App. 667; Smart v. Kansas City, 91 Mo. App. 586.   (6)   The threat by plaintiff to George Begley, Jr., to bring a suit in attachment against him could not form the basis of duress.  Wood v. Tel. Co., 223 Mo. 537; Dausch v. Crane, 109 Mo. 323; Claflin v. McDonough, 33 Mo. 412; Holmes v. Hill, 19 Mo. 159; Ellis v. First Natl. Bank, 260 S. W. 714; Murray Fixture Co. v. Sullivan, 115 Pac. 259; Miller v. Davis' Estate, 52 Colo. 485; Hart v. Strong, 183 Ill. 349; Van Alstine v. McAldon, 121 Ill. App. 27; Chambers v. Irish, 132 Iowa, 319; Riney v. Doll, 225 Pac. 1059; Morse v. Wordsworth, 155 Mass. 233; Goos v. Goos, 57 Neb. 294; Creveling v. Saladino, 89 N. Y. Supp. 834; Lillienthal v. Brewing Co., 102 N. Y. Supp. 1051; Hart v. Walsh, 146 N. Y. Supp. 235.

*Sam M. Phillips* and *Abington & Abington* for respondents.

(1) The evidence of communicated threats was competent. Schultz v. Catlin, 47 N. W. 947; Price v. Bank, 128 N. W. 898; Bryant v. Levy, 52 La. Ann. 1649; Bell v. Campbell, 123 Mo. 1; Swoboda v. Nowak, 225 S. W. 1079. (a) Evidence of threats is admissible coming indirectly from third parties when such threats are connected with the party accused of duress. 4 Ency. Evidence, p. 907, note 42; State Bank v. Hutchison, 62 Kan. 9; Marks v. Crume, 16 Ky. L. Rep. 707; Olivari v. Menser, 39 Tex. 76; Schultz v. Catlin, 78 Wis. 611; Taylor v. Jaques, 106 Mass. 291. (b) Communicated threats are competent in self defense cases. State v. Birks, 199 Mo. 276; State v. Wilson, 250 Mo. 323; State v. Nelson, 166 Mo. 203; State v. Lee, 66 Mo. 167; State v. Elkins, 63 Mo. 159; State v. Davis, 284 Mo. 695; State v. Harrod, 102 Mo. 609; State v. Beckner, 194 Mo. 299; State v. Spencer, 160 Mo. 123; State v. Harris, 76 Mo. 364; State v. Greaves, 243 Mo. 540; State v. Hayden, 83 Mo. 199. Where it is claimed that defendant's acts were in self-defense, evidence of threats made by deceased or the person assaulted, whether made to the defendant directly or to third persons, where defendant knew thereof, is admissible. State v. Beckner, 194 Mo. 281; State v. Herrod, 102 Mo. 590; State v. Hayden, 83 Mo. 198; State v. Harris, 76 Mo. 361; State v. Lee, 66 Mo. 165. (2) The court did not err in permitting defendants to testify to the intention they had in endorsing the note in question. Defendants had a right to testify that in endorsing the note they did so to avoid George Begley, Jr., being prosecuted and that it was for this reason that they signed the note, and for no other. State v. Lyle, 296 Mo. 427; Smith v. Bailey, 200 Mo. App. 627; Van Sickle v. Brown, 60 Mo. 634.

GRAVES, C. J.—Plaintiff sued the defendants as indorsers on a $10,000 note dated November 1, 1919,

which note was payable to plaintiff. The makers of the note were George Begley, Jr., and his wife Edith Ruth Begley. At the time of the execution of the note sued upon herein, the plaintiff held four notes, aggregating $70,000, which purported to be signed by George Begley, Jr., and his wife Edith Ruth Begley, as makers, and by George Begley and Effie M. Ruth as indorsers. It is not disputed that all the names to these four notes were forgeries, except the name of George Begley, Jr. The first to become due of these four notes was one for $10,000, which by its terms would have been due on November 2, 1919, or one day after the giving of the notes involved herein. The petition is not out of the ordinary for a case of this character, and therefore no further note need be taken of it. There had been some credits given on the note and such were mentioned in the petition, and the prayer asked only for the balance ($62,509.50) and for interest. These credits are not charged or shown to have been the result of payments made by either defendant herein.

The first part of the answer goes into details as to each of the forged notes, and avers them to have been forgeries committed by George Begley, Jr., and that the plaintiff had knowledge of this fact prior to the execution of the note in suit, and that such act of George Begley was a felony, and so known to be by plaintiff, and its agents, attorneys and representatives, at the time, and before the execution of the note in suit. All this might be denominated as matters of inducement preceding the real defense pleaded by the defendants in their answer. This defense was twofold; (1) an illegal consideration, i. e. a promise to forego the prosecution of George Begley, Jr., and (2) a plea of duress. The reply met the answer upon all new matter therein. Upon a trial had there was a verdict for the defendants, and the plaintiff has appealed. In the brief there are only thirty-eight assignments of error. The "Points and Authorities" in the brief cut the number of fighting questions down to seven. These go to as many different questions.

This is a short and general outline. The evidential facts are left to the opinion, under the several contentions made in the brief.

I.   The first vital question is, whether or not the threatened action to bring a civil suit by attachment (where the said suit would at least be partly based upon the commission of a felony) will suffice to sustain a plea of duress.   There is ample evidence upon which the jury could find that the representatives of the plaintiff (three in number, including a vice-president, and two lawyers) did threaten said action by attachment, and had actually prepared petition, affidavit and bond for that purpose. It should be said at this point that the competency of the evidence on this threatened action in question is vigorously assailed, and this we leave for further discussion. The proposition we have in view for this paragraph of the opinion is, whether or not a threatened civil action in attachment will suffice to sustain a plea of duress, under the circumstances of this case.   To state it differently, whether or not a civil action under any circumstances will suffice to sustain a plea of duress, where as here, there is evidence from which it might be found that the signatures of defendants were superinduced by such threatened civil action in attachment.   Upon the question we now have before us, this court has but recently spoken.   [Mississippi Valley Trust Co. v. Begley, 298 Mo. 684, 252 S. W. 76.]

This is the identical cause of action involved here. It had been brought in St. Louis, and plaintiff had judgment on the pleadings, which were practically the same as in the case at bar.   The claim was that the answer did not contain a good plea of duress, and this view was entertained upon the circuit.   It suffices to say that the majority of this court took the opposite view, and held that the answer contained a good plea of duress.   The case is so fresh that we all recall it.   Judge JAMES T. BLAIR concurred in the result, as I happen to know, be-

*Duress: Threatened Civil Action.*

cause he thought the answer sufficiently plead a threat to prosecute a criminal action, as well as a civil action by attachment. The writer dissented, because, as he viewed the answer, it did not sufficiently charge a threat that plaintiff would prosecute criminally. So, in this case, we must take the law, as we find it. The majority of the court has ruled that the threat to institute a civil suit in attachment (in which suit the felonious acts of the son of the one defendant, and the son-in-law of the other, would be exposed) was sufficient as a plea of duress, in obviation of a contract made under such duress. That case is of such recent date that it would be useless to press again the individual views of the writer. Bowing to the majority rule, we must rule (under the case, supra) that the threatened civil suit by attachment (which would expose the criminal acts of George Begley, Jr.) was a sufficient basis for the plea of duress in this case, and it only remains to see if the plea is sustained by facts. But the determination of the question, supra, is peculiarly important, because the defendants submitted their defense upon but two theories only, (1) that the note was signed by reason of an agreement not to prosecute George Begley, Jr., for forgery, he being the son of defendant George Begley, and the son-in-law of the defendant Ruth, and was thereby without lawful consideration, and against public policy, as well as violative of law, and (2) that there was duress, under the facts, in threatening to institute the civil suit by attachment, by which the felonious acts of George Begley, Jr., would be known to the world, and especially to the officers of the law, whose duty it was to prosecute. The alleged threat to prosecute George Begley, Jr., was not submitted in the instructions for plaintiff, and that matter as a distinct basis for duress was abandoned. However, evidence of such threat, if there was such, would be competent to show the state of mind of the defendants at the time they signed the note.

II. Another vital question in the case is whether or not the threats to bring the attachment suit, and thus

expose the forgeries of George Begley, Jr. (if such threats were made), had to be made directly to the de-

**Direct Threats.** fendants, or whether or not it sufficed if such threats were brought to the knowledge of the defendants prior to the signing of the note. Up-on this matter the two defendants stand in a little different attitude. The defendant George Begley, Sr., testified that the three representatives of the plaintiff called upon him in person, and one short quotation from his testimony will suffice. Begley, Sr., as a witness, among other things, said:

"Q. You may tell the jury, Mr. Begley, what was said between you and these gentlemen at that time—just from the time they called—what took place. A. Well, they pulled out four notes, handed them to me and asked me if that was my signature. I looked at the notes and I said, 'No, that's not my signature,' and then they said, 'Your son has forged your name.' I was so dumbfounded and shocked for quite a while I was speechless and couldn't hardly catch myself; and one of them—I don't know which one now, one of the two that were strangers—said, 'We are down here for the purpose of getting these notes fixed up, and we have got the papers prepared and expect to have them fixed up, and if not we will have to file an attachment suit and bring criminal prosecution,' or something along in that effect. It's been so long ago I don't just remember the exact words. When they started to go out I followed along behind, and when they got close to the front end of the store Mr. Green turned around and asked me if I was going to be in town all day. I told him so far as I knew I was, and they went on out then, and that was the last I saw of them until in the afternoon."

If this was believed by the jury, as it evidently was, it disposes of this defendant, so far as threats were concerned. As a fact the representatives of the plaintiff had left St. Louis fully armed and prepared to bring an attachment suit. All arrangements for a bond had been made in St. Louis, before they started for Poplar Bluff,

where George Begley, Jr., and the defendants Begley, Sr., and Mrs. Ruth resided. As a fact, whether before or afterwards, they did dictate a petition, and an affidavit in attachment, as well as an attachment bond. But we have here the direct threat to Begley, Sr., to bring an attachment suit, which would expose the felonies, and in addition a threat to prosecute criminally.

We pass now to the situation of Mrs. Ruth, and this requires a further detail of the evidence, which applies to her, and also to defendant Begley, Sr., in a way.

III. The first thing the representatives of the plaintiff did was to call upon W. H. Meredith, whom they knew to be the attorney for Mrs. Ruth in all matters in which she was interested. It is admitted by these representatives that they called upon Meredith for that reason, but as they said to see what Meredith would say as to Mrs. Ruth's signature to the note. Mr. Meredith told them that it was not the signature of Mrs. Ruth, and got for them different signatures of that lady, until they were satisfied that her name was a forgery. Later they came back and asked Meredith to arrange for a meeting with Begley, Jr., which he did, and this was after they had seen Begley, Sr., a portion of whose testimony we have quoted, supra. They did not see Mrs. Ruth until later, as we will indicate more fully later.

*Indirect Threats.*

These representatives were exceedingly busy that morning, for they called at the law office of Sam M. Phillips, and finding that he was confined to his home by reason of illness, they proceeded to the home, and asked if he would consider the matter of employment in the event that they had to bring suit. Phillips told them that he was in a position to accept employment, but could do nothing that day. They asked about a stenographer, and Phillips told them that they could use his office and his stenographer, if they had occasion to draw any papers. At this point let it be said that they never did employ Phillips, and when they came to try their suit engaged

other local counsel. These representatives don't claim to have employed or retained Mr. Phillips. They went no further than to find whether or not he was in position to consider employment, and let it drop at that. They went to Mr. Phillips's office, and dictated the petition, affidavit and bond to Miss Higgins, the stenographer in Mr. Phillips's office, who according to the evidence also did outside work.

According to arrangements made by Mr. Meredith, they all (Meredith, then representing Begley, Jr.), the three representatives of plaintiff, and George Begley, Jr., met at the Elks Club at about eleven o'clock A. M. There one of the representatives of plaintiff showed George Begley, Jr., the notes, and asked about the genuineness of the signatures of Begley, Sr., and Mrs. Ruth, and young Begley replied: "They are forgeries, and I am at your mercy."

Again it was said by a representative of plaintiff, "These notes being forgeries, what have you to offer us to take them up." The foregoing from the testimony of Mr. Meredith. The witness, Meredith, then thus proceeds:

"George offered to give them a mortgage on his farms, his rice crop and anything else he had. Mr. Roudebush said, 'Your farms already have two mortgages on them and our institution is not accepting third mortgages. What else have you to offer?' George then stated, 'as I remember it, if they would give him time enough he believed he could get his father and Mrs. Ruth to sign a new note, and he was asked how much time he wanted and he said six months. Mr. Roudebush said that thirty days was long enough, if he would get them to sign a new note due in thirty days. When George offered to give him a mortgage on the property Mr. Roudebush said, 'We can get all that security by attachment in two hours,' and refused to consider that security, and then George stated if they would give him time enough he could get, he thought, the signatures for a six months' note. As I recall it, Mr. Roudebush and Mr.

Green stepped out into the side room and consulted awhile and came back and said if he could get them to sign a ninety days' note they would accept that and not file the attachment suit, and George said he would undertake to do it. Mr. Green and I were standing there, and Mr. Green said to me, as I remember it, 'Will they sign that note?' I told them I didn't think they would.   Here Mr. Roudebush said, '*You see them and report to us at the Ducker Hotel in a couple of hours.*' I went then with George Begley, Jr., down to his father's office on Vine Street. I think it was about 12:30, or a little after.''

Going back to the Elk's Club conversation, this witness further says:

''A.   Well, of course, we were there about an hour, and it was nearly five years ago, and I can't remember, of course, all that was said.   I do recall now, during that conversation that George Begley, Jr., asked Mr. Roudebush and Mr. Hardin, 'Will you prosecute me?' and they said, 'We are not here to discuss that matter.   We want our money.'   They said, however, 'If this matter is not fixed up in two hours we will attach all your property.'

''Q.   Do you remember which one it was that said that?   A.   I think it was Mr. Roudebush.

''Q.   What time was it that that conversation took place?   A.   About a little after noon.   That was the last part of the conversation, after they had gone through the details of what he owed and what he had.

''Q.   He said he would attach all his property if it wasn't fixed up in two hours; is that right?   A.   That's the substance of it; yes.

''Q.   How many times did George Begley, Jr., ask them if they intended to prosecute him?   A.   I think George asked that three or four times.   That seemed to be uppermost in George's mind.   Every time they refused to discuss that question.

''Q.   Refused to discuss it?   A.   Yes, sir.

''Q.   They never stated to him whether they would or wouldn't?   A.   They did not; no.

"Q. What was it they told you to do—who to see? A. Well, as I recall it, Ernest Green and I were standing close together and he said to me, 'Will the old folks sign the note?' And I said I didn't think they would. It might have been Mr. Roudebush standing right there, too, and he said, 'You see them and call us at the hotel in a couple of hours.'

"Q. He was speaking to you? A. Yes, sir."

Here we have the specific directions from plaintiff's representatives (and a vice-president was present at the time) for Mr. Meredith to see both Begley, Sr., and Mrs. Ruth. It is clear from all that was done and said that they expected Mr. Meredith, as well as George Begley, Jr., to explain to the father and the mother-in-law, the things about which they talked, and what they said, in this Elk's Club conversation. No other reasonable deduction can be made from all that was done and said, and from the specific directions given. They did not expect Mr. Meredith to get the signatures, without detailing the necessity for them. What they said was a commission to Meredith to tell Begley, Sr., and Mrs. Ruth just what was happening and what they intended and threatened to do, if the signatures were not forthcoming in two hours. Meredith had told them that he did not think they would sign, but they thought that Meredith could put the fear into them by explaining to them fully what was to be done, and the legal effect of such action. That they intended this to be done by Meredith is the only reasonable conclusion to be drawn from the facts, and under the directions given him, he (Meredith) was their spokesman to communicate the threats, and the whole situation. So that from this consideration alone, what Meredith and Begley, Jr., said to the father and the mother-in-law, was as if these representatives had said it themselves, as Begley, Sr., says they did say as much to him.

It must not be overlooked that this is a trial before a jury, and the findings of the jury preclude this court, if there is substantial evidence upon which the finding can stand. Of course substantial evidence means also com-

petent evidence.  But as said the directions given to Meredith to see these parties about signing the note, was a commission to him to explain to them the necessity for their signatures ''within two hours.''  It was as if the three representatives of plaintiff had gone in person, and explained to both parties just what had been done and said at the Elk's Club meeting.  In addition it must not be overlooked that Mr. Meredith was general counsel for Mrs. Ruth, and the plaintiff's representatives singled him out for that very reason.  They were there to get security, and they expected Mrs. Ruth's attorney to explain to her all that was going.  We need not go further as to the evidence of what Meredith told defendants.  Nor as to what George Begley, Jr., told them.  We will, however, discuss the further legal phases of such evidence.

IV.  Going further as to admissibility of the evidence of Meredith, and others, who communicated the threatened attachment suit to defendants, and the effect that it had upon them, we shall take up some cases in point.  We, in so doing, must not overlook **Threats Indirectly Communicated.** the ruling in Mississippi Valley Trust Co. v. Begley, 252 S. W. 76.  This because, that ruling is the law of the instant case.  This case and that case are one and the same case.  The plaintiff dismissed the case in the city of St. Louis, and reinstituted the identical case in Butler County, and we are now reviewing the result of the trial in Butler County. We must not overlook the further fact that, in our opinion in the case supra, we placed a threatened civil action in attachment (which action would within itself disclose a felony) upon the same plane as a threatened criminal prosecution.  In fact many of the citations in the opinion in Begley's case, supra, are threatened criminal prosecutions.  So that in determining the admissibility of evidence, we can and should go to the whole field of duress cases.  When we dissented in the Begley case, supra (298 Mo. 684), we had in mind what we

thought to be the general rule, i. e. that it was not duress to institute, or threaten to institute, any civil suit which the party had the legal right to institute, and that there would be no basis for duress if the threatened action was one which the law gave the right to bring. [9 R. C. L. p. 722.] But our views were brushed aside, when this cause of action was before us, in the case, supra, and we do not intend this as a belated moan, but only in explanation of our present effort to follow the majority opinion, which is the law of the present case. So now to the case law on the admissibility of the evidence of Meredith and others upon communicated threats.

Thus in Schultz v. Catlin, 78 Wis. l. c. 612, we have this language: ''The testimony also tends to prove that there was no conversation between plaintiff and defendant in respect to the giving of the note, but plaintiff required of the brother defendant's signature thereto, and such requirement and the alleged threats were communicated to her by her brother before she signed the note, as the plaintiff evidently intended they should be. The testimony is amply sufficient to support the findings that there was no valid consideration for the note, and that the makers gave it because of the plaintiff's threats to institute a criminal prosecution against her brother for the alleged larceny, and to avoid such prosecution. If the consideration of the note was an illegal one, or if there was no consideration therefor, collection thereof cannot be enforced. If the note was given because of the threats of plaintiff to prosecute the brother for the crime charged, and to avoid such prosecution, the defendant is not liable upon it. It is quite immaterial that such threats were not made directly to the defendant. They were made to her brother, with the intention on the part of plaintiff that they should be communicated to her, and they were so communicated. In some sense the brother was the agent of plaintiff to make such communication, and it is the same as though they were made to her by the plaintiff in person. Moreover, if the consideration of the note was that plaintiff would not prosecute the brother

criminally, it was an illegal consideration, and vitiates the note. [Schultz v. Culbertson, 46 Wis. 313.]''

So, too, AMES, J., in Taylor v. Jaques, 106 Mass. 1. c. 293 et seq., says: ''The case finds that there was an un-settled account between Jaques and the plaintiffs, and that he insisted that, if any balance was due to them, it was much less than they claimed. They on their part not only insisted that he was in debt to them in the sum of $700, but that he had been guilty of the crime of embez-zlement. *They had communicated to his father, and also to the defendant Clark,* who was the father's friend and agent in the matter, their determination to commence a criminal prosecution immediately, unless their demand of the payment of that sum should be complied with at once. This being the relation of the parties, they met at the plaintiff's counting-room in New York, and there a settlement took place, and the note in suit was given. In order to avail himself of his defense on the ground of duress, it was incumbent on Jaques to prove that he signed the note under a reasonable and well-grounded be-lief, derived from the conduct and declarations of the plaintiffs, that if he did not sign it he would be arrested and prosecuted on a criminal charge. Without such a belief or expectation there was no duress. It was cer-tainly proper, therefore, that he should be allowed to prove what the plaintiffs did and said, at and just be-fore that interview, tending to create or justify such a belief. If, at that interview, Clark, who was there as his friend, and with a view to his relief, received from the plaintiffs any private intimations as to what they in-tended to do if security should not be given, and in a whisper informed him what that intention was, it is obvious *that the effect on his mind would be exactly the same as if the information or threat came to him directly from the plaintiffs themselves. His will might be con-trolled as effectually by one mode of communication as the other.* The ruling of the court therefore, in excluding Clark's testimony as to what the plaintiffs said to him, and what he thereupon communicated to Jaques about

their intention to have him arrested if a settlement should not be made was erroneous.''

It was held error to exclude the testimony of one to whom the threats were made and who communicated the threats to the one invoking duress by means of threats. In this case the plaintiff had made no direct threats to defendant Jaques. This case as well as the Schultz case, supra, is on all-fours with the case at bar.

DOSTER, C. J., in Bank v. Hutchinson, 62 Kan. l. c. 11 et seq., goes even a step further, and says:

''The jury found that the note and mortgage of $4,000 on the homestead were executed by Mrs. Hutchinson under the duress of her fears excited by Morris's threat to arrest and criminally prosecute her husband. As before stated, this threat was not made to her, nor was it made to her husband, but it was made to her husband's business associates and by them communicated to him and by him to her. Counsel for plaintiff in error contend that a plea of duress by threats can only be sustained by proof of threats directly made to the person from whom the unwilling act was required or the involuntary contract extorted; or that, if such threat is not thus directly made, but is conveyed through an intermediary, it must be by an agent of the threatener's choosing, specifically designed by him to be an organ of communication. The evidence did not show that any agency for the communication of the threat was selected by Morris, or that he had any specific design that it should be communicated to Mrs. Hutchinson. Notwithstanding this we feel clear that the threats need not be directly communicated. If one makes threats the natural and reasonable consequence of which is to put another in a state of fear, and if they do put the other in a state of fear, and induce, through the duress of such fear, the performance of an act by him, the one who makes the threats should be held responsible for his wrong. The effect is one which, in the law of casual connection, proximately results from the unlawful act. Nor need there be, as we think, a specific design in the mind of the wrong-doer to produce

the effect which follows. It is sufficient that the effect be one which follows as a natural and reasonable consequence from the unlawful act.

"In the case of Taylor v. Jaques, 106 Mass. 291, it appeared that a promissory note was signed under the duress of fear excited by threats not communicated directly by the creditor to the debtor, but communicated by the former to another, and by him to the debtor. The court held that, 'on an issue whether a promissory note was made under duress, evidence is admissible that the person to whom the payee made threats against the maker reported them to the maker, in the absence of the payee, just before the making of the note.' In Schultz v. Catlin, 78 Wis. 611, 47 N. W. 946, it was ruled:

" 'A note signed by a sister because of threats by the payee to prosecute her brother for a crime, and in order to avoid such prosecution, cannot be enforced against her by such payee. It is immaterial that the threats were not made directly to the sister, if they were intended to be communicated to her and were so communicated.'

"The case of Giddings v. Iowa Savings Bank, 104 Iowa, 676, 74 N. W. 21, is quite like the one we have for consideration. In that case a creditor charged his debtor with being a defaulter in respect to a mutual business trust, and threatened him with a criminal prosecution and imprisonment unless he and his wife would execute a mortgage on their homestead to secure the amount of the default. The husband communicated the threats to his wife, and under the duress of her fears excited thereby she executed the mortgage. The evidence of this secondary communication, although that of the husband, was received and held proper. We disagree, however, with that case in one particular. We do not believe that the husband was a competent witness to prove the communication to his wife of the threats which had been made to him. However, the point raised by counsel, and which we have thus far considered only, does not concern the competency of the testimony by which the secondary communication was proved, but it concerns the question

310 Mo. Sup.—20.

whether the communication must be direct, or whether it may be secondary or otherwise more remote. Upon that question the case cited is an authority.

"The case of Schultz v. Catlin, supra, intimates that, in order to the reception of the evidence of threats secondarily communicated, there must be a specific design in the mind of the threatener that the communication should be made. In this we do not agree, but believe that the general rule which holds a wrong-doer liable for the consequences which naturally and reasonable follow his act applies in such case as it does in other and analogous ones. It also appears in that case, and likewise in Giddings v. Iowa Savings Bank, supra, that the reception of the evidence of the secondary communication was rested somewhat upon the theory of an implied agency in the one to whom the threats were made to act as a medium of communication to the third person. Without holding to the contrary of such theory, we are persuaded that the better ground upon which to rest the rule of admissibility of the evidence is the one which we have above stated."

The threats may be implied from what is said and done. In the case of Benedict v. Roome, 106 Mich. l. c. 380, GRANT, J., said:

"We think the decree correct. It is unnecessary to detail the evidence at length. Mr. Weir and his attorney studiously sought to avoid any such threats as would vitiate the security they might take. If the court were to be governed alone by the words used to her by them, the position of the defendants might be sustained; but we cannot ignore the conclusion that the conduct of her husband was suddenly disclosed to her, that she understood that he had committed a crime, and that the papers referred to by Mr. Weir as lying upon the table were prepared as the basis of a criminal prosecution. We think it clear that she gave the mortgage under an implied threat of criminal prosecution. If they so meant it, and she so understood it, and for that reason gave the mortgage, it was obtained by duress and undue influence, just

as certainly as though an express threat had been made. The learned circuit judge saw the witnesses, and was therefore better able to judge their truthfulness and to reach a correct conclusion. We see no occasion to reverse the decree. The case comes within the rule establishd in the following cases: Meech v. Lee, 82 Mich. 274; Miller v. Lumber Co., 98 Mich. 163; McCormick Harvesting Machine Co. v. Hamilton, 73 Wis. 486.''

In the foregoing case the husband was guilty of embezzlement, and the wife gave a mortgage on her property to make good the husband's default. No direct threat to prosecute for a crime was made. The lower court set aside the mortgage on the grounds of duress, and the judgment was affirmed, as indicated by the language of Judge GRANT.

The cases, or some of them, proceed upon the idea that duress is a condition of mind, bereft of the power to act as an ordinary individual; that the real issue is more whether or not threats were communicated, rather than whether threats were made, and the further idea of what effect the alleged threats had. We are, however, rather impressed with the language of the Kansas court in the Hutchinson case, supra, where it says: ''There were three substantive litigated questions in the case: (1) Were threats made? (2) If so, were they communicated to Mrs. Hutchinson? (3) If so, did they produce the claimed effect?''

In Giddings v. Iowa Savings Bank, 104 Iowa, 1. c. 679, it is said:

''The wife was not present at the interview between the bank officers and Giddings, when the alleged threats were made, but plaintiffs claim that she was told by him what had occurred when he came home in the evening. Both husband and wife were permitted, over defendant's objection, to testify to what was said by the husband to the wife on this occasion. The bank officers, in the interview with Giddings, were demanding a mortgage on his homestead. They knew that this instrument must be signed by the wife. If they unlawfully threatened Gid-

dings in order to procure the mortgage and note, they must have known that to comply with their demands he would be compelled to disclose the facts to his wife. In principle, it is the same as though defendant's officers had requested Giddings to inform his wife of their desire and purpose. The evidence, we think, was rightfully admitted. [Schultz v. Catlin, 78 Wis. 611, 47 N. W. 946; Taylor v. Jaques, 106 Mass. 291.] The gist of this testimony was simply that the husband told his wife what had been said to him by defendant's officers. Its admission did not contravene Section 3642, Code 1873, which forbids husband or wife divulging confidential communications made by one to the other."

Duress (under the later views of the courts) is thus defined in Galusha v. Sherman, 105 Wis. l. c. 277-278, and thus approved in the later case of Price v. Bank of Poynette, 128 N. W. l. c. 897:

"Further recitals of the evidence would seem unnecessary. It is ample to support the verdict to the effect that plaintiff was induced by threats to sign the bill of sale, and that such threats so affected the plaintiff's mental condition that at the time he signed the bill of sale he was incapable of the free exercise of his will power. The plaintiff at time of signing was seventy-four years of age, greatly distressed, and willing to do anything possible, as the evidence tends to show, to save his son from arrest. This seems manifest from the fact that he turned over everything he had, including his little homestead and even his woodpile, when in fact, as appears from the defendant's receipt in evidence, the full amount of the shortage had been paid without the property covered by the bill of sale. But whether the articles covered by the bill of sale were necessary to complete the amount of the shortage or not is not material, since the evidence is ample to support the verdict that the bill of sale was executed by the plaintiff while under duress.

"As to what constitutes duress has been often considered and discussed by this court. [Galusha v. Sherman, 105 Wis. 263, 81 N. W. 495, 47 L. R. A. 417; Mc-

Cormick H. M. Co. v. Hamilton, 73 Wis. 486, 41 N. W. 727; Schultz v. Catlin, 78 Wis. 611, 47 N. W. 946; Mack v. Prang, 104 Wis. 1, 76 Am. St. 848; Wolff v. Bluhm, 95 Wis. 257, 60 Am. St. 115; Bank v. Kusworm, 91 Wis. 106, 64 N. W. 843; Rochester M. T. Works v. Weiss, 108 Wis. 545, 84 N. W. 866; Bennett v. Luby, 112 Wis. 118, 88 N. W. 37; Bank v. North, 114 Wis. 645, 90 N. W. 1016; Rueping L. Co. v. Watke, 135 Wis. 616, 116 N. W. 174.]

"In defining duress in Galusha v. Sherman, 105 Wis. at pages 277 and 278, 81 N. W. at page 500, 47 L. R. A. 417, this court said: 'Duress, in its broad sense, now includes all instances where a condition of mind of a person, caused by fear of personal injury or loss of limb, or injury to such person's property, wife, child, or husband, is produced by the wrongful conduct of another, rendering such person incompetent to contract with the exercise of his free will power, whether formerly relievable at law on the ground of duress or in equity on the ground of wrongful compulsion. . . . There is no legal standard of resistance which a party so circumstanced must exercise at his peril to protect himself. The question in such case is, was the alleged injured person, by being put in fear by the other party to the transaction for the purpose of obtaining an advantage over him, deprived of the free exercise of his will power, and was such advantage thereby obtained? If the proposition be determined in the affirmative, no matter what the nature of the threatened injury to such person, or his property, or the person or liberty of his wife or child, the advantage thereby obtained cannot be retained. The idea is that what constitutes duress is wholly a matter of law and is simply the deprivation by one person of the will power of another by putting such other in fear for the purpose of obtaining, by that means, some valuable advantage of him. The means by which that condition of mind is produced are matters of fact, and whether such condition was in fact produced is usually wholly matter of fact, though, of course, the means may be so oppressive as to render the result an inference of law.'

"The controlling element in such cases seems to be whether the means used considering all the circumstances of the case are such as to prevent the free exercise of the will power. [Galusha v. Sherman, supra.] In McCormick H. M. Co. v. Hamilton, supra, there had been threats of criminal prosecution which it was claimed induced the signing of a mortgage. No physical restraint had been exercised, but the threat was of imprisonment of the son of the person induced to sign the mortgage, and it was held that such threats were sufficient to unduly influence and overpower the persons signing the mortgage, so that she did not act of her own free will and therefore did not sign away her homestead of her own free will, and that such acts should be declared void. *Nor is it necessary that threats should be made directly.* If they are made to a third person, with intent that they be communicated, and they are so communicated, that is sufficient. [Schultz v. Catlin, 78 Wis. 613, 47 N. W. 946.]"

While our Missouri civil cases contain no specific discussion on the point of communicated threats, yet such evidence has been used, and not rejected by this court. We have dealt with communications not directly made by the beneficiaries of the contract. See Hensinger v. Dyer, 147 Mo. 1. c. 229, where we approve Benedict v. Roome, 106 Mich. 378, where the threats were communicated. See also Bell v. Campbell, 123 Mo. 1. c. 14 et seq., and Turley v. Edward, 18 Mo. App. 676, and cases cited therein.

We shall not quote further from the cases. There are some cases to the contrary, but the weight of modern authority is to the effect that the threatened action need not be communicated directly, but it suffices if the threat is made, and is communicated, whether directly or through a third person. It is therefore ruled that the evidence of Meredith and others as to the communicated threats, and as to how they effected the two defendants, is competent.

The instant case is peculiarly strong. The threats, as communicated, are admitted. That the agents of the

plaintiff intended them to be communicated is the only natural inference. Before they ever talked with Begley, Jr., they had acquired all the information they needed to bring an attachment suit founded upon the felony of Begley, Jr. They told Begley, Jr. (after he had admitted the forgeries), that they could get all the property he had by attachment within two hours. They did not want that security. They wanted just what they got, the signatures of these two defendants, and they got them by threatening exposure of the young man's wrong, knowing that this would upset the father and mother-in-law. They gave young Begley two hours in which to get the signatures, and directed that he and Meredith see what they could do, and report in two hours. They had asked the elder Begley, after he told them his signature on the four notes were forgeries, whether he would be in town all day. Why: Because they wanted an interview with young Begley, so as to start the ball rolling in the direction of Begley, Sr., and Mrs. Ruth. They expected that all they had said and done would be repeated to these old people, and that it would have the effect it did, i. e. procure their signatures to the note. To say the least, a jury could have so found from all the facts, and their finding is binding upon us.

The foregoing dispose of most of the objections to the evidence, and also the objection to Instruction B for the plaintiff. There are one or two objections to the evidence we shall discuss.

In the foregoing we have not undertaken to quote from or cite many other cases upon communicated threats. We have confined the discussion to a few of the many leading and pointed cases.

V. Miss Higgins testified in the case, and identified the transcripts of her notes, as to the petition, affidavit, and bond in the attachment. There is no evidence that Mr. Phillips was of counsel for plaintiff, and all the evidence shows is that he permitted the counsel for plaintiff

Privileged
Communication.
to use his office, and his stenographer, who, as shown, did other work outside of her work for Mr. Phillips. She was paid by the counsel for plaintiff. The contention is that the dictations were privileged. The Missouri cases cited, i. e. State v. Dawson, 90 Mo. 149, and Tyler v. Hall, 106 Mo. 313, do not sustain the contention. The rule precludes an attorney from disclosing the communications between attorney and client. Miss Higgins occupied no such role. The instruments dictated were not communications between attorney and client. They were mere facts which indicated what plaintiff intended to do, as done by its authorized agents. But in addition to the foregoing all the facts of the case show that such was the intent of plaintiff, if the signatures to the new note were not obtained. It wanted the bona-fide signatures of defendants in lieu of the forged signatures. What is is above said applies to the instruments themselves.

VI. Objection was made to the introduction of a blank deed of trust, from the office of George Begley, Jr., upon which appeared the seal of an acknowledging officer. At most this only tended to show that Begley, Jr., was
Forged
Deed.
a forger, which fact he had frankly admitted to representatives of the plaintiff. It was at least harmless, in view of all other facts in the case.

VII. Learned counsel for plaintiff, in their lengthy assignment of errors, do not assign as error the giving of Instruction A for the plaintiff, as we now find upon a critical examination of such assignment of errors. At first we thought it was covered. But we find it is not covered in either the assignment of errors, the points and authorities or the argument. Neither do they press in their points and authorities the refusal to give plaintiff's instructions numbered 4 and 5. These instructions simply declared to the jury that if defendants, Begley, Sr., and Mrs. Ruth, were induced solely by the threats to bring a civil action by attachment, then they could not

be excused from the payment of the note. Such were the views of the writer and Judge JAMES T. BLAIR upon the case at its former hearing here (298 Mo. 684), but such views were left stranded by the majority opinion, which is now the law of this case.

The situation of the scene, when these two old people and the wife discovered the plight of George Begley, Jr., beggars description. They all met at the home of George Begley, Jr., who was wildly walking the floor, and begging to be saved from the threatened action of plaintiff. Both Mr. Meredith, George Begley, Jr., and others were there to tell just what was being said and done. It suffices to say that, under the opinion when the case was before this court in the first instant, we find no substantial error. What we deem to be competent evidence justified the verdict. At least it was such as not to authorize this court to ignore the verdict upon the ground that there was no substantial evidence to sustain it. The case seems to have been tried in accordance with our majority views upon the former trial. In such case, we must affirm, notwithstanding our individual views, at such former hearing, and notwithstanding the fact that at common law (a part of our judicial system) no duress could be predicated upon the threatened act to bring a mere civil action, founded, here, upon an admitted forgery.

From it all, we conclude the judgment *nisi* should be affirmed, and it is so ordered. All concur, except *Walker* and *White, JJ.*, absent.